FILED
CLERK, U.S. DISTRICT COURT

Nov 5, 2014

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ PMC _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER LEWERT, on behalf of himself and all others similarly situated, ) ) ) | CASE NO. 2:11-cv-10803-SVW-SH |
| Plaintiff, ) ) | ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION |
| v. ) ) | [131] |
| BOIRON, INC.; BOIRON USA, INC.; and LABORATORIES BOIRON, ) ) ) | |
| Defendant. ) ) ) | |

## I.    INTRODUCTION

The thrust of this case is that, although a spoonful of sugar may help the medicine go down, the sugar alone won't help anything else. This putative class action arises from the allegedly misleading label that defendants Boiron, Inc. and Boiron USA, Inc. (collectively, "Boiron") use on Oscillococcinum ("Oscillo") and Children's Oscillo (collectively, "Oscillo"). (Second Amended Complaint ("SAC") ¶¶ 1–2.) Oscillo and Children's Oscillo are homeopathic flu remedies. (SAC ¶¶ 1, 21.) Plaintiff Christopher Lewert ("Lewert") alleges that neither product is capable of relieving flu-like symptoms. (SAC ¶ 2.) Accordingly, he claims that statements on both products' labels indicating that they relieve such symptoms are false. (SAC ¶ 9.)

Lewert filed his second amended complaint on May 19, 2014. In his complaint, Lewert

asserts claims against Boiron for violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., and California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 et seq.  Currently before this Court is Plaintiff's second motion for class certification.[1]  (Dkt. 131.)  Lewert seeks to certify the class of "[a]ll California residents who after July 27, 2012, up to the date of the first Class Notice in this action purchased Oscillococcinum and/or Children's Oscillococcinum."  (P's Mot. Class Cert. 10.)  For the reasons discussed below, the Court modifies the proposed class definition and GRANTS IN PART Lewert's motion for class certification.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Boiron manufactures and distributes over-the-counter, homeopathic remedies—including Oscillo and Children's Oscillo.  (SAC ¶¶ 1, 21.)  Homeopathic remedies use "natural substances, often in ultra-dilute doses" to treat illnesses.  (Henry Decl., Ex. C ¶ 29.)  The active ingredient in both Oscillo and Children's Oscillo is an ultra-diluted solution of water and a combination of incubated duck hearts and livers.  (SAC ¶¶ 2-5.)  This dilution is created by mixing an initial solution of 1% duck heart and liver combination with 99% distilled water.  (SAC ¶ 4.)  One percent of this initial solution is combined with 99% distilled water.  (*Id.*)  This process is repeated 200 times to create the final dilution. (*Id.*)

Lewert claims that under well-established principles of chemistry, this process yields a solution so dilute that it cannot possibly contain a single molecule of the incubated duck hearts and livers.  (SAC ¶ 6.)  Because Oscillo is created by placing this ultra-dilute solution on sugar pellets, Lewert claims that Oscillo is simply a sugar pill.  (SAC ¶ 5.)  Thus, Lewert alleges that any relief provided by Oscillo comes solely from the placebo effect.  (SAC ¶ 10.)  Accordingly, he asserts that Boiron's representations that Oscillo is capable of relieving flu-like symptoms are false and misleading.  (*Id.*)

### A.    Procedural History in this Case

On December 29, 2011, plaintiff Leonidas Jovel filed a class action against Boiron.  (Dkt.

---

[1]  As discussed below, Leonidas Jovel was the original named plaintiff and filed the first motion for class certification.  *See* (Dkt. 124, Feb. 27, 2014 Order) (denying Jovel's motion for class certification).

1.)  The complaint asserted claims arising from Boiron's alleged misrepresentations on Oscillo's packaging.  Jovel sought damages, restitution, and injunctive relief for Boiron's purported breach of express warranty and violations of the UCL and CLRA.  (Dkt. 1: Complaint, ¶¶ 41–70, Prayer for Relief.)

In its August 16, 2013 Order, this Court dismissed Jovel's claim for injunctive relief for lack of standing.  (Dkt. 78: Order, at 9–10.)  The Court found that because Jovel was now aware of the misleading nature of Oscillo's label, he faced no threat of future injury.  (*Id.*)

In its February 27, 2014 Order, this Court denied Jovel's motion for class certification.  (Dkt. 124.)  The Court found that Jovel was not an adequate class representative because of serious credibility issues.  (Dkt. 124: Order, at 8.)  In his deposition, Jovel testified that he relied on a store clerk's recommendation in choosing Oscillo and did not read the label until after buying it.  (*Id.* at 4, 7.)  After a break, Jovel changed his testimony about whether he looked at the label.  (*Id.*)  When asked why his story changed, Jovel first said his testimony was not inconsistent and later said that a conversation with his attorney during the break refreshed his recollection.  (*Id.*)  Because Jovel's inconsistent testimony was significant and related to a material issue in the case, the Court found him inadequate.  (*Id.* at 7–8.)  The Court did not address any of the other requirements for class certification.

### B.    Lewert's Claim Against Boiron

On May 19, 2014, Jovel was voluntarily dismissed and Lewert was added to this action.  (Dkt. 127.)  Lewert simultaneously filed the second amended complaint against Boiron.  (Dkt. 128.)

Lewert claims he purchased Oscillo from Walgreens in Los Angeles on January 3, 2014**.**  (Syverson Decl., Ex. 2, at 130:1–13.)  He purchased Oscillo because he felt ill after returning from visiting his family in Chicago.  (*Id.* at 127:17–128:9; Pl's Mem. P.&A. 3.)  He claims he decided to buy Oscillo based on its label's statement that it treats flu-like symptoms.  (Syverson Decl., Ex. 2, at 131:22–132:9.)  Lewert stopped taking Oscillo after two doses, but kept the box with the remaining product.  (*Id.* at 137:1–5; 138:19–20.)  When Oscillo didn't help his symptoms, Lewert did some brief online research regarding Oscillo's ingredients.  (*Id.* at

141:3–8.)  Lewert found and read an online posting that was similar to a Wkipedia entry or forum post and described Oscillo, its ingredients, and how it is made.  (*Id.* at 20:13–23.)  He discovered that Oscillo's active ingredient was "a very minute portion of a duck liver that is boiled in many hundreds of gallons of water and then extracted and done again,"  and on that basis decided that it wasn't going to do anything for him.  (*Id.* at 154:11–18; 141: 3–8.)

Lewert returned to Chicago on a business trip approximately one week after purchasing Oscillo.  (*Id.* at 142:9–14.)  While in Chicago, he told his brother, John Lewert ("John") that he had taken Oscillo and that it didn't work.  (*Id.* at 149:4–10.)  John then told him to contact attorney Joe Siprut ("Siprut").  (*Id.* at 149:9–10.)  Joe also resides in Chicago.  (*Id.* at 144:1–23.)  John went to high school with Siprut, and the two lawyers occasionally refer cases to each other.  (Henry Decl., Ex N, at 19:20–23; 20:16–21.)  At the time of Lewert's second trip to Chicago, Siprut represented Lewert's mother as a class representative in the class action *Wanderski v. Advocate Health & Hospital Corp.* and Lewert's brother in the class action *Lewert v. Vendini, Inc.*  (Def's Opp. 6.)  Siprut was also counsel in two other cases against Boiron related to Oscillo—*Conrad v. Boiron, Inc.* and *Bohn v. Boiron, Inc*.  Lewert returned from Chicago after approximately three days, on or around January 13, 2014.  (Henry Decl., Ex N, at 151:3–5.)

### C.    Settlements in Other Cases

This is not the only action against Boiron alleging that it made false representations on its product labels.  On September 2, 2011, California consumers filed a putative class action against Boiron claiming California consumer fraud violations and breach of express warranty.  *Gallucci v. Boiron, Inc.*, No. 3:11-cv-2039 (S.D. Cal. filed Sept. 2, 2011).  As in the instant action, the *Gallucci* plaintiffs argued that Oscillo's active ingredient was either ineffective or so heavily diluted that it "is not actually present in the Oscillo" products.  (Dkt. 54-1, Ex. A ("*Gallucci* FAC") ¶ 23).  Thus any representation that Oscillo treats flu-like symptoms was purportedly false.  (*Id.* ¶¶ 12-30, 64(a)).

On October 31, 2012, the *Gallucci* court approved a class settlement.  (SAC, Ex. 1 ("*Gallucci* Settlement"); SAC, Ex. 2 ("*Gallucci* Judgment").)  The settlement offers a $5 million class fund for those who purchased Oscillo between January 1, 2000 and July 27, 2012.  (*Id.* ¶¶

4, 6(B)).  Further, Boiron agreed to place two disclaimers on its product labels, packaging, and website stating that Oscillo's uses have not been evaluated by the FDA and explaining homeopathic dilutions.  (*Gallucci* Settlement ¶¶ 4, 6(B)).  Boiron was required to implement the disclaimers within 24 months from the settlement's effective date.  (*Gallucci* Settlement ¶ 4.1.5).  Boiron began shipping 30-dose packages of Oscillo with the disclaimers in approximately September 2013.  (Supp. Land Decl. ¶ 8a.)  The 6-dose and 12-dose Oscillo packages with disclaimers were introduced into the market in August and July 2014 (respectively.  (*Id.* ¶¶ 8b–8c.)  Boiron also agreed to create a program to give interested purchasers a full refund.  (*Id.* ¶¶ 1.34, 4.1.6).  Though it was not required to do so, Boiron continued offering refunds even after the disclaimers were implemented.  (Land Decl. ¶ 13.)  Notice of settlement was promulgated via: (1) direct notice to class members, (2) a settlement page on Facebook, (3) an online advertising campaign that included a dedicated website, (4) summary notices published in USA Today and two health-related magazines, and (5) a press release on a national newswire.  (Sherwood Decl. ¶¶ 13–17, 19, 22–25.)

In *Delarosa v. Boiron, Inc.*, No. SACV 10-1569-JST (CWx) (C.D. Cal., removed Mar. 3, 2010), a class of California consumers sued Boiron for alleged misrepresentations on its Children's Coldcalm packaging.  *Delarosa v. Boiron, Inc.*, 818 F. Supp. 2d 1177, 1180 (C.D. Cal. 2011).  On November 6, 2013, the *Delarosa* court entered a final judgment approving a class settlement.  (Henry Decl., Ex. I ("*Delarosa* Judgment").)

## III.   LEGAL STANDARD

As a threshold matter, a plaintiff seeking class certification must show that "an identifiable and ascertainable class exists."  *Guido v. L'Oreal, USA, Inc.*, No. CV 11-1067 CAS JCX, 2013 WL 3353857, at *18 (C.D. Cal. July 1, 2013) (quoting *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009)).[2]  This requirement is met where the class can be defined

---

[2]  While neither the Ninth Circuit nor the Supreme Court has expressly adopted this requirement, the Ninth Circuit has acknowledged it in dicta.  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1071 n.3 (9th Cir. 2014); *see also Lilly v. Jamba Juice Co.*, No. 13-CV-02998-JST, 2014 WL 4652283, at *2 (N.D. Cal. Sept. 18, 2014).  Additionally, numerous other courts hold that such a requirement exists.  *See, e.g.*, *Lilly*, 2014 WL 4652283, at *2–3; *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW AGRX, 2012 WL 8019257, at *4 (C.D. Cal. Apr. 12, 2012); *Mazur v. eBay Inc.*, 257

through objective criteria. *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *5 (C.D. Cal. Apr. 9, 2014) (quoting *Guido*, 2013 WL 3353857, at *18). "A class is sufficiently ascertainable if the proposed class definition allows prospective plaintiffs to determine whether they are class members with a potential right to recover." *Id.* (quoting *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 593–94 (C.D. Cal. 2008)) (internal quotation marks omitted). Class members' actual identities need not be known to the parties at the time of certification. *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012).

A party seeking class certification must satisfy two requirements. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001). First, the moving party must show that the proposed class meets four criteria: (1) the members of the proposed class must be so numerous that joinder of all claims would be impracticable ("numerosity"); (2) there must be questions of law and fact common to the class ("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of absent class members ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a).

Second, the moving party must demonstrate that the class fulfills the conditions of at least one of the three subdivisions of Rule 23(b). Lewert asserts that the class meets the requirements for Rule 23(b)(3). To qualify for certification under this subsection, a class must satisfy two conditions: (1) common questions of law or fact must "predominate over any questions affecting only individual members," and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement is satisfied where common questions comprise a significant portion of the case and can be resolved for all class members in one adjudication. *See In re ConAgra Foods, Inc.*, —— F. Supp. 2d ——, No. CV 11-05379 MMM AGRX, 2014 WL 4104405, at *6–7 (C.D. Cal. Aug. 1, 2014). Rule 23(b)(3)'s predominance requirement also requires the moving party to show that "damages are capable of measurement on a classwide

F.R.D. 563, 567 (N.D. Cal. 2009).

1    basis." *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S. Ct. 1426, 1433 (2013). Specifically,

2    this requires plaintiffs to tie their method of proving damages to their theory of liability.[3] *Id.*

3          "The party seeking certification bears the burden of showing that each of the four

4    requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Zinser*,

5    253 F.3d at 1186. A party seeking to certify a class may not merely rest on his pleadings.

6    Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with

7    the Rule—that is, he must be prepared to prove that there are ***in fact*** sufficiently numerous

8    parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——,

9    131 S.Ct. 2541, 2551 (2011) (emphasis added). Thus, a trial court is expected to engage in

10   "rigorous analysis" to determine if the moving party has discharged its burden. *Dukes*, 131 S.Ct.

11   at 2551 (quoting *Falcon*, 457 U.S. at 161). This analysis often "will entail some overlap with the

12   merits of the plaintiff's underlying claim." *Id.*

13   **IV.    DISCUSSION**

14        **A.    Ascertainability**

15        Boiron argues that the proposed class is not ascertainable because: (1) identifying class

16   members would be administratively infeasible because Boiron lacks records of individual

17   purchasers and most consumers do not keep receipts for purchases of cheap products such as

18   Oscillo; (2) the Court would have to determine whether the complained-of Oscillo purchase

19   occurred after the close of the *Gallucci* class period;[4] (3) the Court would have to individually

20   determine the effect of the *Gallucci* settlement publicity campaign on each class member; and

21   (4) the proposed class is overly broad because it includes people who were not injured—such as

22

23   [3] Nevertheless, class certification is not defeated solely by the requirement to engage in
     individualized damages calculations. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir.

24   2013) (allowing class certification where individualized damages could readily be calculated from
     computerized payroll records).

25   [4] Boiron also argues that the Court would need to determine whether the individual also

26   purchased Oscillo during the *Gallucci* class period because the *Gallucci* settlement released all
     future claims. (Defs.' Opp. 10–11.) This argument misstates the *Gallucci* settlement agreement,

27   which only released those future claims arising from purchases made during the defined class
     period. *See* (*Gallucci* Settlement ¶¶ 1.7, 6.1–6.2.) Additionally, notwithstanding Boiron's

28   argument to the contrary, the *Delarosa* settlement does not apply to claims arising from Oscillo
     and is thus irrelevant to whether a person is a member of the current proposed class. (*Delarosa*
     Judgment.)

those who benefitted from Oscillo, those who already received a full refund pursuant to Boiron's refund program, and those who purchased Oscillo upon a doctor's recommendation rather than based on Boiron's representations.[5]

Lewert's proposed class is defined based on objective criteria—whether a consumer purchased Oscillo within the relevant class period. Even without receipts, these consumers can submit self-identifying questionnaires or similar documents identifying themselves as class members. Admittedly, courts are not of one mind regarding the propriety of self-identification in consumer class actions. *See, e.g.*, *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 (3d Cir. 2013) (rejecting self-identification in consumer class action); *Sethavanish v. ZonePerfect Nutrition Co.*, No. 12-2907-SC, 2014 WL 580696, at *4–6 (N.D. Cal. Feb. 13, 2014) (following *Carrera* and holding that proposed class of nutrition bar purchasers was insufficiently ascertainable); *but see Forcellati*, 2014 WL 1410264, at *5–8 (rejecting *Carrera* and holding that proposed class of homeopathic remedy consumers was sufficiently ascertainable); *Allen v. Hyland's, Inc.*, 300 F.R.D. 643, 658–60 (C.D. Cal. 2014) (finding proposed class of homeopathic remedy users sufficiently ascertainable).

This Court is persuaded by the reasoning of *Forcellati* and similar cases holding that self-identification is sufficient. If it were not, there could never be a class action for low-priced consumer goods. *Astiana v. Kashi Co.*, 291 F.R.D. 493, 500 (S.D. Cal. 2013). Thus, a rule rejecting self-identification would bar class actions in the very cases where class actions are most needed—where a large group of consumers each suffers a small harm. *Lilly*, 2014 WL 4652283, at *4. Moreover, self-identification will serve only to identify class members—not to "establish the fact or extent of [Boiron's] liability[.]" *Id.* at *6. Instead, Boiron's total liability will be determined in the aggregate by measuring its total sales.[6] Thus, contrary to Boiron's

[5]  Boiron also argues that the class is not ascertainable because there have been multiple Oscillo labels. As discussed in more detail below, this concern is eliminated by the Court's limitation of the class definition to purchases made before Oscillo's new labels with the *Gallucci* disclaimers appeared in the stream of commerce.

[6]  The Court rejects Boiron's argument that its aggregate sales cannot be used to determine its total liability because of the *Gallucci* settlement. This argument relies on Boiron's misreading of the *Gallucci* settlement as a release of all class members' future claims regarding Oscillo. The

1     argument, it has no due process interest in determining class members' identities.  *Forcellati*,

2     2014 WL 1410264, at *5–6.

3         Additionally, consumers are even more likely to remember purchasing Oscillo than were

4     members of classes involving other products for which courts accepted self-identification.  *See,*

5     *e.g. Astiana*, 291 F.R.D. at 500–01 (S.D. Cal. 2013) (food products); *Guido*, 2013 WL 3353857,

6     at *18–19 (hair products); *Ries*, 287 F.R.D. at 535–36 (iced tea).  As illustrated by Lewert's

7     claim, consumers' purchase of Oscillo is often tied to an episode of the flu afflicting either the

8     purchaser or someone close to him.  Given the flu's infrequent and somewhat debilitating nature,

9     consumers are more likely to remember when the illness occurred.  They are thus more likely to

10    remember when they purchased Oscillo.  This is particularly true given that the proposed class

11    includes only fairly recent purchasers.

12        However, the Court recognizes that the *Gallucci* settlement raises issues different from

13    those facing *Forcellati* and other courts allowing self-identification.  Given that the *Gallucci*

14    settlement releases all claims arising from purchases made before a specific date, it is

15    particularly important to know the exact date of the individual's purchase.  Otherwise this Court

16    risks disregarding a sister court's judgment and requiring Defendants to pay a double

17    satisfaction.  Absent receipts or similar records, it is likely that consumers will only accurately

18    recall the approximate time period of their purchase.  This may be problematic for purchases

19    allegedly made within the first month or so of the proposed class period.  Nevertheless, this

20    concern regarding the apportionment of damages is insufficient to defeat class certification.

21    While the Court has serious reservations about the feasibility of proving whether purchasers at

22    the class period's outset may recover, it retains broad flexibility to deal with such manageability

23    problems if and when they come to fruition.  *Forcelatti*, 2014 WL 1410264, at *7.

24        Also inapposite is Boiron's argument that its refund program renders the class

25    unascertainable.  Boiron presumably maintains records of the individuals to whom it pays

26    refunds.  Thus, the class is not unascertainable merely because it potentially includes refund

27    _____

28    same is true of Boiron's argument regarding the *Delarosa* settlement, which does not apply to
      Oscillo.

1    recipients.  The Court can readily deal with this issue during the damages phase.  *See Rodman v.*

2    *Safeway, Inc.*, No. 11-CV-03003-JST, 2014 WL 988992, at *17 (N.D. Cal. Mar. 10, 2014).

3         Finally, the Court rejects Boiron's argument that the class is overbroad because it

4    includes potentially uninjured persons.  As a preliminary matter, Boiron is incorrect that persons

5    who experienced a benefit while taking Oscillo were not injured by the alleged misreprsentation.

6    Lewert argues that Oscillo contains no active ingredient, and thus that any benefit obtained from

7    Oscillo is actually due to the placebo effect.  Thus, consumers were still harmed by the alleged

8    misrepresentation even if they experienced a benefit while taking Oscillo.  *Forcellatti*, 2014 WL

9    1410264, at *9.  Moreover, the class is not unascertainable merely because it might include some

10   persons who did not rely on the purported misrepresentation—whether because of exposure to

11   publicity surrounding the *Gallucci* settlement, reliance on a doctor's recommendation, or

12   otherwise.  This question is more properly addressed under the Rule 23 requirements.  *Guido*,

13   2013 WL 3353857, at *18–19.

14        For the aforementioned reasons, the Court finds that the proposed class is sufficiently

15   ascertainable.

16        **B.    Rule 23(b) Requirements**

17        Because of the relationship between the Rule 23(b) and Rule 23(a) requirements, the

18   Court addresses Rule 23(b) first.

19             1.    Predominance

20        The predominance inquiry requires that the common issues be "qualitatively substantial"

21   compared to individualized issues.   *Forcellatti*, 2014 WL 1410264, at *11 (citing *Hanlon v.*

22   *Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)).  This standard is "far more demanding"

23   than the Rule 23(a) commonality requirement.  *Amchem Products, Inc. v. Windsor*, 521 U.S.

24   591, 623–24 (1997).

25        The crux of Lewert's claim is that Oscillo is nothing more than a placebo with no

26   medicinal value.  Accordingly, he claims that any representation that Oscillo is capable of

27   relieving flu-like symptoms is false.  Lewert claims that the same mispresentation appeared on

28   the product package and thus was made to all class members.  Moreover, both the UCL and

1   CLRA allow Lewert to establish the elements of reliance, causation, and damages by proving

2   that Boiron's misrepresentation was material. *Forcellatti*, 2014 WL 1410264, at *9 *(citing *In*

3   *re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009); *In re Steroid Hormone Prod. Cases*, 181 Cal.

4   App. 4th 145, 157 (Cal. Ct. App. 2010)); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022

5   (9th Cir. 2011) (quoting *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (Cal. Ct. App. 2009)).

6   Materiality is an objective inquiry, determinable on a classwide basis. *Id.*; *In re Tobacco II*, 46

7   Cal. 4th at 326–27. Accordingly, proof that Oscillo is based on "bunk science" and that Boiron's

8   contrary representation is material will largely resolve class members' claims. Therefore

9   common questions of law and fact predominate. *Forcellati*, 2014 WL 1410264, at *11–12.

10       Boiron argues that because of the publicity of the *Gallucci* settlement and class members'

11   reliance on multiple sources of information, Lewert cannot use classwide proof of reliance and

12   causation by showing materiality.[7] These arguments are not persuasive. First, under California

13   law, consumers' subjective motivations are irrelevant to the objective issue of materiality. *See*

14   *id.* at *11. Moreover, Boiron cannot reasonably argue that consumers would purchase a product

15   that they did not believe was effective. *See McCrary v. Elations Co., LLC*, No. EDCV 13-00242

16   JGB OP, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014) ("Defendant cannot reasonably

17   argue that a putative class member would purchase a product that does not work, regardless of

18   who recommended it."). Additionally, the publicity campaign expressly denies that Boiron's

19   statements were false. (Henry Decl., Ex. F, at 122.) Thus, the publicity campaign surrounding

20   the *Gallucci* settlement does not defeat Lewert's ability to show reliance on a classwide basis.

21   Boiron's argument regarding multiple sources of information fails for similar reasons.

22   *Forcellati*, 2014 WL 1410264, at *11; *Guido*, 2013 WL 3353857, at *5.

23       Boiron also argues that under the CLRA,[8] causation cannot be proved classwide where

24   "the issue of materiality or reliance is a matter that would vary from consumer to consumer." *In*

---

[7]  Boiron's objection based on the existence of multiple packages is inapposite in light of the Court's limitation of the proposed class period.

[8]  Boiron also argues that Lewert cannot rely on classwide proof of reliance and causation under the UCL. To support this argument Boiron relies on *In re Vioxx Class Cases*. However, the cited portion of *In re Vioxx* deals only with classwide proof the CLRA. *In*

1    *re Vioxx Class Cases*, 180 Cal. App. 4th at 129.  However, even if Boiron can establish a lack of

2    causation as to some class members, that does not mean that causation cannot be shown

3    classwide.  *Id.*  Moreover, it defies logic to say that the importance of the representation that a

4    product is capable of having any effect is one that would ordinarily vary from consumer to

5    consumer.  Thus, causation is provable classwide.

6                                        a.    Classwide Damages

7            Under *Comcast*, a plaintiff must set forth a model for calculating classwide damages that

8    ties the damages sought to the theory of liability.  *Comcast*, 133 S. Ct. at 1432–33.  This question

9    invariably requires at least some individualized inquiry.  *Allen*, 300 F.R.D. at 670 (C.D. Cal.

10   2014) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir.2013).  Lewert

11   asserts that Oscillo is nothing more than a sugar pill and is thus worthless.  Accordingly, he

12   asserts that each class member is entitled to recover his full purchase price.  Thus, he presents a

13   model for calculating classwide damages that is tied to his theory of liability.  *Id.* (holding that

14   plaintiffs' contention that they were entitled to full restitution of purchase price for allegedly

15   worthless drug was sufficient).

16           For the aforementioned reasons, the Court finds that Lewert satisfies the Rule 23(b)(3)

17   predominance requirement.

18                                        2.    Superiority

19           A class action is superior where the cost of litigating on an individual basis would dwarf

20   recovery.  *Allen*, 300 F.R.D. at 671 (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d

21   1168, 1175–76 (9th Cir. 2010).  Here, each class members' restitution claim is small.  According

22   to Lewert, the amount in controversy for each individual claimant is under $20.  (Pl's Mem. P. &

23   A. 25.)  The costs of litigating each of these claims would easily eclipse each claimant's

24   potential recovery.  Accordingly, a class action is the superior form of adjudication.

25           Boiron's argument that a class action is not superior where there is a privately-created

26   refund program is inapposite.  Rule 23(b)(3) requires a class action to be the superior form of

27   "*adjudicating* the controversy," not of recovering.  *Allen*, 300 F.R.D. at 672.

28           **C.    Rule 23(a) Requirements**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1. Numerosity

To satisfy the numerosity requirement, Plaintiffs must show that the class is "so numerous that joinder of all members is impracticable." Rule 23(a)(1).  Though Boiron disputes numerosity, Lewert propounded sufficient evidence to satisfy this requirement.  *See* (Syverson Decl., Ex. 20) (indicating that in the 24 weeks ending  on February 16, 2013, over 10,000 units of Oscillo were sold in the "natural products supermarkets" channel in Northern California alone).

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Rule 23(a)(2).  While all questions of law or fact need not be common, the putative class's claims must depend on a common contention capable of classwide resolution—meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *In re ConAgra Foods, Inc.*, 2014 WL 4104405, at *23 (quoting *Dukes*, 131 S. Ct. at 2551).

The Court finds the commonality requirement satisfied for the same reasons that it finds the predominance requirement satisfied.

### 3. Adequacy

The named parties must "fairly and adequately protect the interests of the class."  Rule 23(a)(4).  This requirement looks to whether the named plaintiffs and their counsel have any conflicts of interest and whether they will prosecute the action vigorously on behalf of the class.

### a. Lewert's Adequacy

There is no indication that Lewert will not fairly and adequately protect the interests of the class.  He has demonstrated a familiarity with the issues of the case and a willingness to vigorously pursue relief by participating in the litigation process.  *See, e.g.*, (Syverson Decl., Ex. 2, at 19:19–20:25; 119:17–120:7; 123:11–17; 159:8–21; 170:20–171:2.)

Boiron argues that Lewert is inadequate because of purported credibility issues and conflicts of interest arising both from his relationship with Siprut and from his pursuit of an individual action for injunctive relief in state court.

*(1)     Lewert's Credibility*

As discussed in this Court's February 27, 2014 Order, courts find a class representative inadequate where he faces significant credibility issues on a mater critical to the litigation. *See* (Dkt. 124: Order, at 6) (citing *Savino v. Computer Credit, Inc.*, 173 F.R.D. 346 (E.D.N.Y. 1997), *aff'd* 164 F.3d 81 (2d Cir. 1998)). Boiron alleges that Lewert colluded with Siprut to manufacture a case and that he thus purchased Oscillo with knowledge of the instant litigation. This would defeat any allegation that Lewert actually relied on the alleged misrepresentations, which would defeat his standing to assert a UCL claim or a CLRA claim on the class's behalf. *See Bohn v. Pharmavite, LLC*, No. CV 11-10430-GHK AGRX, 2013 WL 4517895 (C.D. Cal. Aug. 7, 2013) (noting that named plaintiff must prove actual reliance to have standing to assert a class claim under the UCL and CLRA and finding named plaintiff inadequate based on credibility issues going toward her reliance on the alleged misrepresentation and her close relationship with counsel).

Boiron argues that: (1) Lewert is a manufactured plaintiff who disingenuously purchased Oscillo in order to join this lawsuit, (Defs' Opp. 16–19); and (2) Lewert's family's (particularly his brother's) close relationship with attorney Siprut creates a conflict of interest and undermines his credibility, (*Id.*). Boiron asserts that Lewert is a straw plaintiff because of the timing of his purchase immediately after spending time with his family, whom Boiron asserts is closely tied to Siprut. (Defs' Opp. 16.) Siprut represented both Lewert's mother and Lewert's brother in their own class action lawsuits at the time of Lewert's second visit to Chicago around January 10, 2014. (Defs' Opp. 6–7.) Boiron also argues that Lewert cannot document his purchase, that Lewert purchased Oscillo to treat some symptoms unrelated to the flu, that Lewert did not remember where in Walgreens Oscillo was located when he purchased it, that Lewert went on a "shopping spree" and flew half-way across the country during the time he supposedly had the flu, and that Lewert's girlfriend and brother don't remember him having been ill at the time of the purchase. (Defs' Opp. 7–8.)

Boiron also asserts that when Lewert flew back to Chicago he "discussed his purchase [of Oscillo] with his brother and Siprut[.]" (Defs' Opp. 18.) According to Boiron, Siprut was

1    already involved in two unrelated cases against Boiron regarding Oscillo, knew of the problems

2    with Jovel's deposition and of a pending motion to dismiss Jovel, and thus knew that Jovel

3    would likely need to be replaced by a new named plaintiff.  (Defs' Opp. 18.)

4          In light of the concerns raised by these arguments, the Court ordered Plaintiff's counsel,

5    Siprut, and Lewert's brother—John Lewert ("John")—to submit declarations addressing

6    Boiron's assertions.

7          Boiron overstates Siprut's involvement in the instant case (particularly given that he is

8    not among proposed class counsel) and Siprut's relationship with John.  According to Siprut, he

9    had no knowledge of the issues regarding Jovel's adequacy until March or April 2014.  (Siprut

10   Decl. 3–4.)  He thus had no such knowledge until several months after Lewert claims he

11   purchased Oscillo, and after Siprut referred Lewert to proposed class counsel.  (*Id.* at 2.)

12   Additionally, Siprut asserts that he had no involvement in the instant case prior to referring

13   Lewert to proposed class counsel in January 2014.  (*Id.* at 2–4.) .

14         Though Boiron makes much of Siprut's financial relationship and "lifelong" friendship

15   with John, its arguments are not borne by the evidence.  Instead, since 2011, John apparently

16   referred three or four cases to Siprut—one of which resulted in a settlement on an individual

17   basis and the allocation of some fees to John's firm based on its time expended.  (*Id.* at 10; John

18   Lewert Decl. ("John Decl.") at 4.)  In another of those instances, John referred his mother to

19   Siprut regarding a possible class action.  (Siprut Decl. at 7; John Decl. at 4.)  Siprut also

20   represented John's wife in two class action that were voluntarily dismissed without any payment

21   to her.  (Siprut Decl. at 8.)  Siprut also represented John in two class actions related to data

22   breaches in 2013 and 2014.  (Siprut Decl. 8–9; John Decl. 4–5.)  Additionally, Siprut referred

23   two cases to John—a divorce case involving a secretary at Siprut's firm and a probate matter.

24   (Siprut Decl. 9; John Decl. 5.)  Siprut also gives John's name, along with several other attorneys'

25   names, to clients who come to him with matters in areas of law that his firm doesn't handle.

26   (Siprut Decl. 10.)  Siprut and John did not pay each other referral fees in any of these cases.

27   (Siprut Decl.9; John Decl. 4–5.)

28         While Siprut and John went to the same high school and knew each other, they were not

1   all that close of friends.  (Siprut Decl. 4; John Decl. 2.)  They lost touch for over five years, and

2   reconnected when they coincidentally ran into each other sometime between 2002 and 2004.

3   (Siprut Decl. 4–5; John Decl 2.)  When they ran into each other they discovered that they were

4   both in or about to enter the legal field and exchanged business cards.  (Siprut. Decl. 5; John

5   Decl. 2.)  For five years thereafter, Siprut occasionally sent John "blast emails" from the firm for

6   which Siprut worked inviting John to various firm events.  (Siprut Decl. 5; John Decl. 2.)  These

7   emails were sent to roughly 700 other people.  (Siprut. Decl. 5.)  After Siprut founded his current

8   firm in 2011, he continued to include John on a list of roughly 700 people to whom Siprut sent

9   blast emails about firm-sponsored events.  (Siprut Decl. 5; John Decl. 2–3.)  Since 2011, Siprut

10  and John were both present at a handful of events.  (Siprut Decl. 5; John Decl. 2–3.)

11  Additionally, Siprut was one of ten lawyers (and two hundred guests) that John invited to his

12  wedding in 2013.  (John Decl. 3.)  John claims he invited Siprut for business rather than social

13  purposes.  (John Decl. 3.)  Siprut briefly spoke with Lewert at his brother's wedding, but has not

14  had any other social relationship with Lewert or other members of his family.  (Siprut Decl. 6.)

15        While circumstances of John's and Siprut's relationship raise concerns that they colluded

16  to manufacture Lewert as a class representative, these concerns are insufficient to dismiss Lewert

17  as class representative.  This finding is further supported by the lack of evidence that Siprut was

18  involved in the instant litigation before Lewert.

19        Additionally, Jovel did not move for class certification until January 21, 2014—nearly

20  three weeks after Lewert claims he bought Oscillo.  The first time Boiron raised the issues

21  regarding Jovel's credibility in a public filing was apparently in its motion for sanctions and

22  vexatious litigation, filed on January 27, 2014. (Dkt. 92.)  Thus, Siprut cannot be charged with

23  even constructive notice of the issues surrounding Jovel until after Lewert purchased Oscillo and

24  after John referred Lewert to Siprut.

25        While the Court rejects Boiron's arguments regarding collusion between Siprut, John,

26  and Lewert, it retains some doubts regarding the bona fides of Lewert's claim.  In particular, the

27  Court is suspicious of Lewert's claim that he decided to stop taking Oscillo after doing his own

28  research.  Lewert claims he decided that Oscillo wasn't going to work after learning of its active

1  ingredient.  However, he lacks a background in pharmacology, chemistry, or a similar field

2  which would allow him to judge Oscillo's efficacy based on its active ingredient.  Lewert is a

3  sales director for a software company's media and entertainment division.  (Syverson Decl. Ex.

4  2, at 40:22–41:12).  He has a dual degree in government and legal studies.  (*Id.* at 51:6–7.)  He

5  took no college courses in chemistry, physics, biology, or medicine.  (*Id.* at 51: 17–25.)  The

6  Court is therefore concerned that Lewert may be disingenuous when he claims that he decided

7  that Oscillo wouldn't work based on his own research regarding its ingredients.  The Court is

8  also somewhat suspicious of John's claim that he invited Siprut to his wedding for purely

9  professional reasons.  However, none of these suspicions are sufficient to render Lewert

10  inadequate.

11      With the one exception, the remainder of Boiron's arguments regarding Lewert's

12  credibility are similarly unfounded.  Nevertheless, Boiron is correct that Lewert admits he

13  purchased Oscillo to treat some non-flu symptoms (nausea and diarrhea) in addition to flu

14  symptoms.  This could suggest that he did not rely on the representation that Oscillo treats flu-

15  like symptoms in purchasing it.  Nevertheless, this does not establish that Lewert didn't rely in

16  part on Boiron's alleged misrepresentation (which is all that is needed for Lewert to assert his

17  UCL and CLRA claims).  *See Forcellati*, 2014 WL 1410264, at *11.  Additionally, this is not a

18  significant enough attack on Lewert's credibility to render him inadequate.  The issues raised by

19  Lewert's admission are very different from the inconsistencies in Jovel's deposition that

20  rendered him inadequate—namely his admission that he didn't rely on the alleged

21  misrepresentation and subsequent attempt to save face.  *See* (Dkt 124: Order, at 3–8.)

22                          *(2)    Lewert's Pending State Court Action*

23      Boiron also asserts that Lewert's pending individual state court action for injunctive

24  relief creates a conflict of interest because the Court previously held that the putative class lacks

25  standing to pursue injunctive relief.  Thus, Boiron argues that Lewert might compromise the

26  class's monetary recovery to obtain injunctive relief.  This argument is inapposite.  Realistically,

27  Lewert is more likely to compromise injunctive relief to obtain more money than the converse.

28  Additionally, this Court could adequately protect absent class members by declining to approve a

1   settlement if it appeared that Lewert comprised the class's interests or by decertifying the class if

2   Lewert did not pursue the case vigorously enough. *Riker v. Gibbons*, No. 308CV00115LRH-

3   RAM, 2009 WL 910971 (D. Nev. Mar. 31, 2009); *Krzesniak v. Cendant Corp.*, No. C 05-06156

4   MEJ, 2007 WL 1795703 (N.D. Cal. June 20, 2007).

5                          *(3)      Conclusions Regarding Lewert's Adequacy*

6          While the Court remains concerned regarding the bona fides of Lewert's representations,

7   the Court finds that Lewert has minimally met his burden of showing his adequacy.  However,

8   the parties are reminded that the Court may always review this determination based on

9   subsequent discoveries and events.

10                         b.      Proposed Class Counsel's Adequacy

11         Lewert requests that the Court appoint as class counsel Bonnett, Fairbourn, Friedman &

12  Balint, P.C.; Stewart M. Weltman LLC; and Westerman Law Corp.  Lewert's proposed class

13  counsel have significant experince in prosecuting class actions, including false advertising cases.

14  (Syverson Decl. Ex. 21.)

15         Given that proposed class counsel represents Lewert in the state court action, Boiron

16  makes the same conflict of interest argument against proposed class counsel.  For reasons similar

17  to those discussed above, the Court rejects this argument as to proposed class counsel.

18         Boiron also asserts that class counsel's involvement in other suits against Boiron (some

19  of which have already settled or are stayed pending resolution in this case) creates a conflict of

20  interest.  The Court finds that any potential conflict created by these other suits is too speculative

21  to render proposed class counsel inadequate.  *See Allen*, 300 F.R.D at 664–65 (considering and

22  rejecting arguments that proposed class counsel's involvement in parallel litigation between

23  plaintiffs and defendants rendered them inadequate).[9]

24         For the aforementioned reasons, the Court finds that proposed class counsel is adequate.

25                         4.      Typicality

26

27  _____

    [9]  Boiron also argues that proposed class counsel engaged in questionable conduct.  However, this
28  argument largely revives the allegations of misconduct already rejected by this Court in denying
    Boiron's motion for sanctions.  *See* (Dkt. 124: Order, at 8–11.)  Boiron's arguments fair no
    better now than they did then.

                                                    18

Rule 23(a)(3) requires a showing that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Typicality requires that "the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 502 (S.D. Cal. 2013) (quoting *Hanlon*, 150 F.3d at 1020).

Boiron argues that Lewert's claims are not typical because: (1) he purportedly lacks credibility; (2) he did not purchase Children's Oscillo; (3) he purchased a package that differs from the photographed package depicted in the SAC and from the new package with the *Gallucci* disclaimers; and (4) he purchased Oscillo to treat the non-flu symptoms of nausea and diarrhea.

As discussed above, Boiron's arguments regarding Lewert's credibility are largely unfounded. To the extent that they are supported by the current record, they do not rise to such a level that he is atypical.

However, the fact that Lewert did not purchase Children's Oscillo is problematic. Though Lewert asserts that the same misrepresentation was made on the packaging used on both Oscillo and Children's Oscillo, the analysis may differ with respect to each product. Children's Oscillo and Oscillo are sold in different packaging. Additionally, the difference between buying a flu-remedy for an adult and buying one for a child may give rise to different considerations that affect the inquiry into the representations' materiality and purported misleading nature. The Court therefore finds that Lewert's claim is atypical as to Children's Oscillo. *See Allen*, 300 F.R.D. at 661–63 (declining to certify class as to two out of twelve homeopathic remedies where no named plaintiff that had a typical claim purchased those products). This case is thus different from *Forcellati*, which found that plaintiffs' claims were typical even as to products that no named plaintiff purchased. In *Forcellati* all complained-of products were children's cold, cough, or flu remedies. *Forcellati*, 2014 WL 1410264, at *10.

19

1    Also problematic is the fact that Lewert purchased a product with a different package

2    than the new one with the *Gallucci* disclaimers (which became available during the proposed

3    class period.[10]  The presence of these disclaimers creates a marked difference between the new

4    package and the previous packages without disclaimers.  The inquiries into the representation's

5    materiality and misleading nature will likely differ significantly with respect to the new and old

6    packages.  Accordingly, Lewert's claim is not typical as to the Oscillo package with the *Gallucci*

7    disclaimers.

8         Nevertheless, the Court can remedy these problems by modifying the proposed class

9    definition.  *In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2014 WL 2758598, at *14 (N.D. Cal.

10   June 17, 2014).  In light of the aforementioned concerns with Lewert's typicality, the Court

11   EXCLUDES claims based on purchases of Children's Oscillo from the class definition and

12   LIMITS the class period to purchases made before the packaging with *Gallucci* disclaimers was

13   introduced into the stream of commerce.

14   **V.    ORDER**

15        1.  Pursuant to Rule 23(b)(3), the Court CERTIFIES the class of all California residents

16   who after July 27, 2012, and up to August 31, 2013, purchased Oscillococcinum as to both the

17   UCL and CLRA claims.

18        2.  The Court APPOINTS Lewert as class representative of the certified class.

19        3.  The Court APPOINTS as class counsel Bonnett, Fairbourn, Friedman & Balint, P.C.;

20   Stewart M. Weltman LLC; and Westerman Law Corp.

21        4.  The Court DENIES the motion for class certification in all other respects.

22   **IT IS SO ORDERED.**

23

24

25

---

26   [10]  Boiron also complains that the packaging purchased by Lewert differs from that depicted in the
     SAC.  However, the same alleged misrepresentations are made on each package and any
27   differences between the two are minor.  The Court accordingly finds Lewert's claim typical as to
     both the package that he purchased and the one depicted in the SAC.  *See Forcellati*, 2014 WL
28   1410264, at *10.

Dated: November 5, 2014

_____
STEPHEN V. WILSON
United States District Judge